**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **STEFAN LEU,** )<br><br>**Plaintiff,** )<br> )<br>**v.** )<br> )<br>**EMBRAER AIRCRAFT MAINTENANCE** )<br>**SERVICES, INC., STRUCTURAL** )<br>**MODIFICATION AND REPAIR** )<br>**TECHNICIANS, INC. d/b/a SMART, INC.,** )<br>**and JOHNSON SERVICE GROUP, INC.** )<br> )<br>**Defendant.** )<br> ) | **Case No. 3:10-0322**<br>**Judge Trauger** |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by defendant

Structural Modification and Repair Technicians, Inc. ("SMART") (Docket No. 42), to which the

plaintiff has responded (Docket No. 59), and SMART has filed a reply in support (Docket No.

68).  Also pending is a Motion for Summary Judgment filed by defendant Embraer Aircraft

Maintenance Services, Inc. ("Embraer") (Docket No. 45), to which the plaintiff has responded

(Docket No. 54), and Embraer has filed a reply in support (Docket No. 69).  Finally, Johnson

Service Group ("JSG") has filed a Motion for Summary Judgment (Docket No. 38), to which the

plaintiff has responded (Docket No. 57), and JSG has filed a reply in support (Docket No. 66).

For the reasons discussed herein, SMART's Motion and JSG's Motion will be granted, and they

will be dismissed from this case.  Embraer's Motion will be granted in part and denied in part.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Stefan Leu, is a married, Arkansas resident who, in November 2008, was hired by defendant Johnson Service Group ("JSG"), which is a staffing agency for the aviation industry.[1]  JSG placed the plaintiff at various aviation corporations, depending on need.  JSG maintains an anti-harassment policy, which includes procedures for an employee to report harassment and for the investigation of any such reports.  The plaintiff was given a copy of this policy upon his hire.

In February 2009, JSG recruiter Julie Lowe placed the plaintiff at defendant Embraer's Nashville, Tennessee hangar to work as an aircraft painter.  Embraer maintains that, at the time of his placement, the plaintiff had an orientation on Embraer's policies and received a copy of Embraer's employee handbook, which, according to Embraer, "contains Embraer's full anti-harassment policy, details for how to report such conduct, and its code of conduct."[2]  (Docket No. 53 at 2.)

The plaintiff initially began working on the day shift at Embraer.  (Docket No. 38 Ex. 1

---

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 53, 56, and 60) and related affidavits and exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

[2]The plaintiff denied this fact in his Statement of Facts, but, in his deposition, the plaintiff recounted an Embraer orientation that lasted "possibly all day," in which "we all sat down in a room with computers and just they had their orientation process, some kind of program we watched mostly about the company and different rules and stuff"  (Docket No. 38 Ex. 1 at 79-83.)  The plaintiff also recalled receiving a copy of the Embraer employee handbook during that orientation. (*Id.*)

at 85.)  During the "two or three weeks" in February 2009 that the plaintiff worked the day shift, the plaintiff saw an unnamed employee briefly walking through the hangar with his pants around his ankles, but, otherwise, the day shift involved little more than "minor horseplay" amongst the employees, and one "inappropriate" text message from Alex Martinez, of the type discussed more below.  (*Id.* at 92-98.)

After a few weeks, the plaintiff was placed on the overnight shift or "night shift."  No females worked on the night shift at Embraer.  The "lead painter" on the night shift was John Stier, Jr., who is an Embraer employee.  Stier was responsible for assigning work and overseeing the employees on the night shift, but the paint shop manager, Embraer's Paul Moore, was ultimately responsible for hiring and firing employees.  (Docket No. 42 Ex. 6 at 9-10.)   Moore typically arrived at work around 4 a.m. and was present for the last few hours of the night shift. Also working the night shift was Alex Martinez, who was employed by defendant SMART, another aviation staffing agency.  According to the plaintiff, Martinez is an "intimidating" figure, about 5 foot, nine inches tall, and a "built" 270 pounds.  (Docket No. 38 Ex. 1 at 45.)

SMART's only direct connection to Embraer is a service agreement between the two entities.  According to the service agreement, any employee of SMART who is provided to Embraer "may be terminated at will, at anytime," by Embraer.  (Docket No. 60 at 3.) Additionally, Embraer was "solely responsible for supervising the work product" of SMART employees and for ensuring that SMART employees followed the relevant OSHA and FAA guidelines.  (*Id.*)  Consistent with this, Martinez had no supervisory authority over the plaintiff, and employees from staffing agencies, such as Martinez and the plaintiff, were supervised and

directed by Embraer personnel. (Docket No. 42 Ex. 6 at 10.)

The plaintiff maintains that he was sexually harassed by Martinez and Stier during his time on the night shift. The plaintiff claims that Martinez frequently sent "nasty" videos, images, and text messages from his phone to the plaintiff and others on the shift, although the plaintiff never actually viewed any of these transmissions.

In his deposition, the plaintiff recounted numerous ways in which Martinez harassed him while at the Embraer hangar. For instance, the plaintiff claims that, while other workers were around, Martinez repeatedly attempted to give him massages, while making "sexual sounds." (Docket No. 38 Ex. 1 at 116.) The plaintiff maintains that he consistently rebuffed these efforts by pulling and moving away. (*Id.*) Also, four or five days after the first massage attempt, the plaintiff claims that Martinez tried "to put his hand up my leg," while the plaintiff was sitting in the break room. (*Id.* at 119-120.) The plaintiff claims that this behavior repeated itself "several times," (with Martinez making "contact" with the plaintiff's genitals on occasion) and, while attempting to grab the plaintiff's genitals, Martinez would say "nasty stuff. You know, he wants your brown eye or he would talk about what he does at home." (*Id.* at 121.) The plaintiff testified that, during the course of his time on the night shift, he observed Martinez attempt to "grab" several other employees as well. (*Id.* at 135.)

The plaintiff also asserted that, "two or three times in the restroom" stall, he caught Martinez attempting to look at the plaintiff using the bathroom through the crack in the stall door. (*Id.* at 125.) The plaintiff testified that this conduct made him "afraid" to go to work and "scared that one day, you know, he was going to try to rape me or something." (*Id.* at 126.)

When asked about Martinez's sexual orientation and proclivities, the plaintiff stated that he believes that Martinez, while married with children, is, at least, "bisexual" and a "very sick man." (*Id.* at 127.) The plaintiff recounted numerous incidents in which Martinez, speaking to a group that included the plaintiff, graphically discussed "sick stuff" regarding his relationship with his girlfriend, and he testified that Martinez would, on a daily basis, ask, in a crass manner, if anyone wanted to watch him masturbate or to give him oral sex. (*Id.* at 128-29.) The plaintiff testified that these types of comments and actions were "constant throughout" the roughly six weeks that he worked on the night shift. (*Id.* at 168.)

The plaintiff testified that Stier contributed to the harassing environment. The plaintiff recounted that, on one occasion, he heard Stier call his name and, when he looked up, Stier "was on top of the plane just butt naked" from the waist down and was crawling around, telling the plaintiff to took at his rear end. (*Id.* at 130.) The plaintiff testified that Stier believed this to have been a "big joke," but "it was just so sick." (*Id.*) Another time, the plaintiff observed Stier wake Martinez from a nap in the hangar by putting his naked rear end right up to Martinez's face. (*Id.* at 140.)

While Stier made fewer "nasty" comments than Martinez did and never touched the plaintiff, the plaintiff testified that Stier would still belittle him, calling him "wet behind the ears," and mocking him for never having been to a strip club or having drunk a significant amount of alcohol. (*Id.* at 141-44.) The plaintiff testified that he attempted to convey his concerns about Martinez to Stier, repeatedly telling Stier that Martinez was "sick" and that his behavior needed to stop. (*Id.* at 104-105, 123, 218-19, 230.) The plaintiff testified that Stier

"knew it was wrong," but Stier decided that he was "just going to let it go, you know." (*Id.* at

124.)  The plaintiff stated that Stier and Martinez were friends and that he represented an easy

target for their bullying, because of his quiet manner and chaste life.  (*Id.*)

By April 2009, the plaintiff decided that he would leave Embraer.  The plaintiff testified

that he was concerned that Martinez was going to "rape" him, and "it got to the point where I

couldn't go into work anymore."  (*Id.* at 167.)   After working what would be his final shift on

April 12, 2009, the plaintiff packed his family and drove back to Arkansas.  Upon his arrival in

Arkansas, on April 15, 2009, the plaintiff contacted Lowe, to tell her that he had resigned and

moved back to Arkansas.   Other than his complaints to Stier about Martinez, this was the first

time that the plaintiff told anyone of his difficulties at Embraer.[3]

The plaintiff testified that he went into "some details"and "some specifics" with Lowe

about the "unprofessional" environment that caused him to quit his job.  (*Id.* at 233-35.)   In

response, Lowe drafted a statement detailing the plaintiff's complaints, which the plaintiff read

and signed.  Lowe provided the plaintiff's statement to her supervisor, Guerdy Claioms, who,

after consulting with Embraer, forwarded the statement to Embraer's human resources

department.

After reviewing the plaintiff's statement, Embraer Human Resources Director Sue Palace

investigated the plaintiff's claims by interviewing Moore, Stier, and Martinez, all of whom

---

[3]Indeed, SMART was completely out of the loop and remained so.  SMART never
received any harassment complaints about Martinez, and SMART did not learn of the plaintiff's
allegations until it was served with the Complaint.  SMART was not named in, or served with,
the plaintiff's EEOC Charge.

denied the plaintiff's allegations. In a second meeting, Palace issued a verbal warning to Stier and Martinez, reminding them that behavior of the type alleged by the plaintiff would not be tolerated. No other inappropriate behavior regarding these individuals was ever reported to the Embraer human resources department.

The plaintiff maintains that he heard that Stier and Martinez were upset by his allegations and that he heard from a former co-worker, George Dollins, that Martinez had told Dollins that he would "f–k up" the plaintiff if he saw him again. (*Id.* at 169.) The plaintiff testified that, despite his allegations, Martinez continued to get painting jobs with the assistance of recruiters. (*Id.* at 133, 183.) The plaintiff refused to take any jobs at which Martinez might be working and finally settled on a job in Great Falls, Montana, because "I knew [Martinez] wasn't going there. It's too cold for him." (*Id.*)

There is considerable dispute in the record regarding the veracity of the plaintiff's allegations. For instance, Dollins, who also worked the night shift, claimed that he was also grabbed by Martinez "many times" and that Martinez, on an "ongoing basis," made crass sexual advances to him, asking, among other things, whether Dollins wanted "any Mexican" inside him. (Docket No. 61 Ex. 3 at 98, 104-107.) Dollins confirmed that he, like the plaintiff, believes that Martinez and Stier are, at least, bisexuals. (*Id.* at 109.)[4]

Mark Vestering, who also worked the night shift and quit around the same time that the plaintiff did, testified that he also saw Stier mooning the plaintiff from the top of the plane

---

[4]Dollins has also sued SMART and Embraer, and his case is currently proceeding in front of District Judge William Haynes as Case No. 3:10-cv-283.

(Docket No. 61 Ex. 7 at 12), but, while he felt that the environment was frequently unprofessional and that Martinez made occasional crass comments, he did not recall hearing or observing many of the specific comments or incidents discussed by the plaintiff and Dollins. (*Id.* at 17-30.) Vestering also testified that he believes Martinez is heterosexual. (*Id.* at 31.) However, based on his experience, Vestering testified that he believes the plaintiff's allegations. (*Id.* at 42.)

On the other hand, Paul Moore testified that, while he was supervisor, he did not hear of or observe any of the misconduct now alleged by the plaintiff and that he would be "surprised" if the plaintiff's allegations were true. (Docket No. 42 Ex. 6 at 52, 57.) Consistent with their strong denials during the internal investigation, both Martinez and Stier, in their depositions, strongly denied the vast majority of the plaintiff's allegations. Martinez did concede that "many, many, many times" he shared text messages and pictures that he had received on his phone and that those pictures were of "girls naked and stuff like that." (Docket No. 42 Ex. 4 at 41.) Martinez also denied ever having "any homosexual experiences." (*Id.* at 45-46.)

Stier testified that he received text messages from Martinez with "pictures of naked women" on several occasions but that he told Martinez to stop sending them. (Docket No. 42 Ex. 8 at 72.) He also testified that, on one occasion, Martinez showed him pictures of naked men that Martinez had just received on his phone and that Martinez may have teased the plaintiff about never attending a strip club. (*Id.* at 74-75, 82.) Stier strongly denied ever having "pulled [his] pants down at work," mooning the plaintiff from the top of the plane, or waking up Martinez by placing his rear end next to Martinez's face. (*Id.* at 83-85.) As to whether the plaintiff ever

complained to him about Martinez, Stier testified that the plaintiff only ever told him that Martinez was "crazy" or "nuts." (*Id.* at 136.)

The plaintiff filed his Complaint against Embraer, SMART, and JSG in Davidson County Circuit Court on December 17, 2009.  (Docket No. 1 Ex. A.)  On March 17, 2010, after receiving his right-to-sue letter from the EEOC, the plaintiff filed his Amended Complaint, which asserts federal claims.  (Docket No. 1 Ex. B.)  The case was then removed to this court on March 30, 2010.  (Docket No. 1.)   On April 30, 2010, the court denied SMART's Rule 12(b)(6) Motion to Dismiss.  (Docket No. 25.)

## ANALYSIS

Counts I and II (sexual discrimination and retaliation) of the Amended Complaint allege causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act (THRA), T.C.A. § 4-21-101 *et seq.*[5]  Counts III and IV allege exclusively state law causes of action for intentional infliction of emotional distress (IIED) and negligent hiring, retention, and supervision.  All defendants have moved for summary judgment on all claims.

## I.      Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

---

[5]As all parties recognize, the Tennessee legislature intended for the THRA "to be coextensive with federal law," and, therefore, the analysis of the Title VII and THRA claims in this context is identical.  *Allen v. McPhee*, 240 S.W.3d 803, 812 (Tenn. 2007).

a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     Legal Standards and Initial Conclusions Relevant to All Motions

While the defendants brought individual motions, as can be seen below, a common analysis can be applied to the plaintiff's retaliation, IIED and negligence claims, all of which are plainly without merit. After discussing these claims, the court will address the plaintiff's sex discrimination/hostile work environment claim, which requires an analysis more tailored to each defendant.

### A.     Retaliation

To establish a *prima facie* case of Title VII retaliation, a plaintiff must demonstrate that

(1) he engaged in activity protected by Title VII; (2) the exercise of his protected rights was known to the defendant; (3) he was subject to an adverse employment action or severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

As relevant here, an employee engages in protected activity by making a complaint to anyone about alleged discrimination. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) (noting that a complaint made "to a co-worker, newspaper reporter, or anyone else about alleged discrimination" constitutes a protected activity). Here, the plaintiff alleges that he complained to Stier (an Embraer supervisor) about Martinez's abusive conduct and that Stier did not do anything about his complaints. The plaintiff also argues that he complained to JSG (after he left Embraer), but JSG made no attempt to return him to work at Embraer and actually worked with Martinez to help Martinez find additional positions. (Docket No. 57 at 11.)

Assuming that the plaintiff has sufficiently shown that he engaged in protected activity, there is still no evidence in the record suggesting that he was retaliated against for doing so. That is, there has been no showing that the plaintiff's complaints to Stier about Martinez's conduct had any bearing on any of the subsequent events in this case, including any continued harassment or any "constructive discharge." Also, there is no evidence that JSG's conduct following the harassment report was in any way retaliatory; for instance, there is no evidence that the plaintiff's failure to return to Embraer was in any way in retaliation for submitting his complaint to Lowe. Therefore, the defendants are entitled to summary judgment on the plaintiff's retaliation claim.

**B.      Intentional Infliction of Emotional Distress (IIED)**

This claim has three elements: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct must result in serious mental injury. *Bain v. Wells*, 936 S.W. 2d 618, 622 (Tenn. 1997). Liability for IIED is only appropriate where "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bryan v. Campbell*, 720 S.W. 2d 62, 64 (Tenn. Ct. App. 1986).

It is not necessary to consider whether the conduct alleged here would meet the high bar of outrageousness, because the plaintiff's claim fails on the third element: he cannot show "serious mental injury." Rather, the plaintiff testified at his deposition that he has headaches and stomach pain, is afraid of Martinez, and had a few anxiety attacks shortly before his deposition, but he conceded that he has not sought medical assistance and has been able to continue to perform his job. (Docket No.38 Ex. 2 at 183, 196-98, 204-205.) The plaintiff's unsubstantiated, deposition induced, anxiety attacks and other assorted maladies are simply insufficient evidence of the "serious mental injury" necessary to demonstrate IIED. *See Bain*, 936 S.W. 2d at 622; *see also cf. Vanover v. White*, 2008 WL 2713711, *18 (E.D. Tenn. July 10, 2008)(serious mental injury is evinced by an inability to "cope" with the mental stress caused by the relevant events).

**C.      Negligent Hiring, Retention, and Supervision**

The defendants have approached this claim from different angles. Embraer argues that a state law claim of negligence that asserts a workplace injury is barred by the exclusivity

provisions of the Tennessee Workers' Compensation Act (TWCA). (Docket No. 46 at 21 citing

T.C.A.§ 50-6-108(a), which states that the "rights and remedies granted to an employee subject to

this chapter, on account of personal injury or death by accident . . . shall exclude all other rights

and remedies of the employee . . . at common law or otherwise, on account of the injury or

death.") Indeed, where there is no allegation of intentional misconduct or an "actual intent to

injure," Tennessee courts have dismissed negligent supervision and retention claims, citing the

exclusivity provisions of the workers' compensation law. *See Bellomy v. Autozone*, 2009 WL

4059158, *10 (Tenn. Ct. App. Nov. 24, 2009).

Alternatively, all defendants argue that the plaintiff's claim fails because, in order to

establish a negligence claim in this context, the plaintiff must show the employer's "knowledge of

the employee's unfitness for the job," with the crucial issue being whether the perpetrator's

conduct was "foreseeable" to the employer. (*See* Docket No. 39 at 11; *see also Doe v. Catholic

Bishop for Diocese of Memphis*, 306 S. W.3d 712, 717 (Tenn. Ct. App. 2008)).

In response to each motion, the plaintiff provides five or six lines of conclusory statements

suggesting that the individual defendant either should have done more to prevent the misconduct

or should have addressed the plaintiff's allegations more aggressively. (Docket No. 54 at 16;

Docket No. 59 at 20; Docket No. 57 at 15.) The plaintiff provides no substantive challenge to the

TWCA argument or any support for the notion that the misconduct alleged here was, in any way,

foreseeable. Indeed, there is nothing in the record to suggest that any defendant had any notice of

any risk posed by Martinez and Stier. For all of these reasons, the defendants are entitled to

summary judgment on this claim as well.

### D.    Sexually Hostile Work Environment[6]

To establish a hostile work environment sexual harassment claim, the plaintiff must show that (1) he is a member of a protected class, (2) he was subjected to harassment based upon sex, (3) the harassment "had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer." *Grace v. USCAR*, 521 F.3d 655, 678-79 (6th Cir. 2008). Title VII is not "a general civility code," and the conduct alleged must be so "objectively offensive as to alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80-81 (1998). Title VII does not regulate "male-on-male horseplay or intersexual flirtation" in the workplace. *Id.* at 81. Likewise, Title VII does not exist to "purge the workplace of vulgarity" or boorish conduct. *Baugham v. Battered Women, Inc.*, 211 Fed. Appx. 432, 439-40 (6th Cir. 2006).

Males are a protected class, but, in order to show that the harassment was based upon sex where the alleged harasser and the victim are males, the plaintiff must show that either (1) the harasser is homosexual or otherwise motivated by sexual desire for the plaintiff; (2) the harasser was "motivated by general hostility" toward men in the workplace; or (3) the alleged harasser treated females better in the mixed-sex workplace. *King v. Super Serv. Inc.*, 68 Fed. Appx. 659,

---

[6]While the plaintiffs' Amended Complaint asserts a claim of sex discrimination, the plaintiff here only argues that he was subjected to a sexually hostile work environment (Docket No. 54 at 4-11), and, therefore, the court considers the plaintiff to have conceded the defendants' arguments that he cannot establish a *prima facie* case of "sex discrimination" under Title VII because, among other things, he cannot show that he was "treated differently than a similarly situated individual outside" of his protected class. (Docket No. 46 at 6 citing *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006)).

663 (6th Cir. 2003). Here, the plaintiff only seeks to proceed under this first element, arguing that Martinez and Stier are homosexuals or that they were at least motivated by sexual desire for the plaintiff. (Docket No. 54 at 7.)

In considering whether the plaintiff's work environment was objectively hostile, all of the relevant circumstances are taken into account, including the frequency and severity of the challenged conduct and its effect on the employee. *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Again, in order to avoid turning Title VII into a "general civility code" for the workplace, it is "crucial" that the plaintiff sufficiently demonstrate that the behavior was "so objectively offensive as to alter the conditions of the victim's employment." *Oncale*, 523 U.S. at 81.

Finally, as to employer liability, where the alleged harassment is conducted by a non-supervisory co-worker, an employer's vicarious liability depends on the plaintiff's sufficiently showing that the employer knew or reasonably should have known about the harassment but failed to take "prompt and appropriate corrective action." *Hawkins v. Anheuser-Busch. Inc.*, 517 F.3d 321, 338(6th Cir. 2008).[7] This standard also applies in cases in which the alleged harasser is not an employee of the employer/defendant. 29 C.F.R. § 1604.11(e); *Wheaton v. N. Oakland*

---

[7]A different standard applies when a supervisor is alleged to have engaged in sexual harassment, but, here, it is not necessary to engage in that analysis because Stier's conduct, even viewing all reasonable facts in the plaintiff's favor, did not create a sexually hostile work environment. Over six weeks, Stier is alleged to have, at most, twice removed his pants, one time mooning the plaintiff from the top of a plane and the other time as he crassly woke up Martinez. Additionally, he is alleged to have made relatively innocuous comments about the plaintiff's lack of experience in certain areas. These allegations, if true, establish crude, boorish, and unprofessional conduct, but they are, in light of the case law discussed above, clearly insufficient to establish a sexually hostile work environment. Therefore, from an employer liability perspective, the court will analyze this case as a co-worker harassment case, focusing on Martinez's conduct.

*Med. Ctr.*, 130 Fed. Appx. 773, 786-87 (6th Cir. 2005).  An employer is generally considered to have sufficient notice of harassment to incur liability when the harassment is "reported to any supervisor or department head who has been authorized – or is reasonably believed by a complaining employee to have been authorized – to receive and respond to or forward such complaints to management."  *Gallagher v. C.H. Robinson W.W.*, 567 F.3d. 263, 277 (6th Cir. 2009).

**IV.    JSG's Motion for Summary Judgment on the Sexual Harassment Claim**

JSG's argument in support of summary judgment on this claim is brief and entirely focused on the "employer liability" issue.  JSG argues that there is "no evidence that JSG 'knew or should have known'" of the alleged harassment.  (Docket No. 39 at 7.)  That is, the plaintiff does not allege that he was harassed by any "employees or agents of JSG" or that he was supervised by anyone from JSG while working at the hangar.  (*Id*.)  Moreover, the plaintiff concedes that he did not avail himself of the harassment reporting procedure provided by the JSG employee handbook, and, in fact, did not inform anyone at JSG of his problems at Embraer until after he had left Nashville.  (*Id.*)

In response, the plaintiff argues that he "reported the harassing conduct" to Stier and that the plaintiff was "under the reasonable understanding that reporting the conduct to his supervisor fulfilled his obligation to report the conduct."  (Docket No. 57 at 6-7.)  Moreover, the plaintiff argues, if JSG had "properly supervise[d]" the hangar during his employment, it would have learned of the harassment, and, where, as here, the harassment is sufficiently pervasive, it is appropriate to "impute constructive notice" on the employer.  (*Id.* at 7 citing *EEOC  v. Freemen*,

2009 WL 4975280 (M.D. Tenn. Dec. 21, 1999)).

The plaintiff's arguments are unpersuasive. From a common sense perspective, there is no evidence in the record suggesting that JSG knew of the harassment, or, given the employment arrangement between JSG and Embraer, that it should have known of the harassment. Moreover, the plaintiff's complaints to Stier are not sufficient. The plaintiff clearly understood that JSG was a staffing agency whose sole function was to place the plaintiff at a job site and that he would be working at the Embraer site, under the supervision of Embraer personnel. Under these circumstances, it is simply unreasonable for the plaintiff to have believed that his reports to Stier about Martinez's conduct would somehow find their way back to JSG, given that there was no connection between Stier and JSG..

Also, it is not clear why JSG would be under any sort of duty to "check in" or somehow monitor the Embraer facility for harassing conditions, or, even if there was such a duty, that the type of harassment alleged here would have been discovered. *See cf. Berthiaume v. Christian Home for the Aged*, 2010 WL 3064238 (E.D. Tenn. Aug. 3, 2010)(finding an employer could be liable for non-employee harassment in the context of an intertwined relationship between a nursing home and its food service provider). JSG had policies and procedures in place to protect its employees against harassment, of which the plaintiff elected not to avail himself. In the absence of sufficient evidence that JSG knew or should have known of the harassment, JSG's Motion for Summary Judgment on this claim will be granted, and JSG will be dismissed from this case.

**III.     SMART's Motion for Summary Judgment on the Sexual Harassment Claim**

### A. Jurisdiction

SMART initially argues that there is no subject matter jurisdiction over SMART because SMART was not named in the EEOC Charge. (Docket No. 43 at 7 citing *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992)). Generally, if a party goes unnamed in a plaintiff's EEOC Charge, there is no jurisdiction for the court to hear the Title VII claim against that party unless there is a "clear identity of interest" between the party identified in the Charge and the unnamed party. *Alexander v. Local 496*, 177 F.3d 394, 411 (6th Cir. 1999). Such an identity of interest exists where the "unnamed party possesses sufficient notice of the claim to participate in [the] voluntary conciliation proceedings" envisioned by the EEOC. *Id.*

Here, as the plaintiff all but concedes (Docket No. 59 at 5), there is no question that SMART never received the Charge, and there is no suggestion that it shares anything resembling a "clear identity of interest" with the other defendants. Therefore, the court concludes that there is no jurisdiction over the Title VII claim against SMART. However, in light of the fact that the Title VII claim and the THRA sexual harassment claim are analyzed in the identical manner, and in light of the fact that the court is familiar with the essence of the claim against SMART from Motion to Dismiss briefing (where the jurisdictional issue was not raised), the court elects to retain supplemental jurisdiction over the THRA claim against SMART. *See* 28 U.S.C. § 1367(c).

### B. Non-Employer Liability

On the THRA claim, SMART maintains that, as a general rule, because it was not the plaintiff's employer, it cannot have liability. (Docket No. 43 at 9.) As discussed in the Memorandum that denied SMART's Motion to Dismiss, the Sixth Circuit has recognized three

theories/exceptions to this rule. The first two theories arise from situations in which the non-employer controls the plaintiff's employment or is an agent of the employer; the final theory, relevant here, protects the plaintiff from a defendant who, although not an employer, "significantly affects access of any individual to employment opportunities." *See Satterfield v. Tennessee*, 295 F.3d 611, 617 (6th Cir. 2002); *Christopher v. Strouder Mem. Hosp.*, 936 F.2d 870, 875 (6th Cir. 1991). Similar to the other theories of liability, whether a defendant "significantly affects" the plaintiff's "access" to employment opportunities depends on the degree of "control" that the defendant exercised over the plaintiff's employment. *Id.*

SMART maintains that it cannot be held liable because it "lacked the control necessary to significantly affect Plaintiff's access to his employment"; indeed, by contract, SMART explicitly designated responsibility for supervision of employees at the hangar to Embraer. (Docket No. 43 at 10-11.) In sum, SMART maintains that it was completely removed from the decision making and supervisory process at Embraer, and, therefore, it cannot be deemed to have "significantly affect[ed] access" to the plaintiff's employment opportunities. (*Id.*)

In response, the plaintiff argues that "the plaintiff's access to employment opportunities was limited by the hostile work environment, which was created in part by a SMART employee or agent." (Docket No. 59 at 6.) Moreover, the plaintiff maintains that he has shown that "SMART was capable of discriminatorily interfering with and significantly affecting Plaintiff's employment opportunities with both Defendants Embraer and JSG." (*Id.* at 8.) The plaintiff maintains that SMART should have more closely supervised Martinez (its employee), and, in so failing, SMART allowed a hostile work environment to develop, which "significantly affected"

the plaintiff's access to employment opportunities.  (*Id.* at 8-9.)

At the Motion to Dismiss stage, the court expressed doubt about the ultimate viability of the plaintiff's civil rights claims against SMART but stated that "discovery should reveal facts bearing upon the precise scope of Martinez's conduct, his workplace interactions with the plaintiff, SMART's knowledge thereof, and SMART's relationship to the Facility.  Once these additional facts become clear, it will be more evident whether this is a case in which SMART can fairly be liable for 'significantly affecting' the plaintiff's employment."  (Docket No. 25 at 10.)

It is now clear that SMART did not "significantly affect" the plaintiff's access to employment opportunities.  The plaintiff's strained arguments aside, discovery has revealed that SMART had no "control" over the plaintiff's employment opportunities; those opportunities were controlled by Embraer and its supervisors.  In the absence of this control, the clear message from the Sixth Circuit is that a plaintiff does not have a claim in this context against a non-employer defendant.  *Satterfield*, 295 F.3d at 618.

 It is also worth noting that, even if the plaintiff got past this hurdle, he could not prove his *prima facie* case of sexually hostile work environment against SMART.  Indeed, the plaintiff has offered no evidence that SMART "knew or should have known of the harassment."  For all of these reasons, SMART's Motion for Summary Judgment will be granted, and SMART will be dismissed from this case.

**V.      Embraer's Motion for Summary Judgment on the Sexual Harassment Claim**

Embraer argues that the plaintiff's sexual harassment claim fails on multiple prongs of the

*prima facie* test.[8]  That is, (1) the plaintiff cannot sufficiently demonstrate that Martinez was driven by sexual desire for the plaintiff, and, therefore, the plaintiff cannot show that the harassment was "based on sex"; (2) the harassment was not sufficiently severe; and (3) there is no basis for employer liability.  (Docket No. 46 at 9-18.)

First, Embraer argues that there is "absolutely no proof" – only the plaintiff's conclusory allegations – that Martinez is a homosexual; rather, all signs point in the other direction, as Martinez is married with children and, when discussing "real sex" at work, he only spoke of sexual relationships with women.  (*Id.* at 9-10; Docket No. 69 at 4.)  There is a clear difference, Embraer argues, between bullying or aggressive horseplay and actions motivated "by a genuine sexual desire for or attraction to" the plaintiff. (Docket No. 46 at 10.)  Embraer cites to the *King v. Super Service, Inc.*, 68 Fed. Appx. 659, 663 (6th Cir. 2003) case, where the Sixth Circuit affirmed summary judgment for the defendant employer where, even though the plaintiff's tormenters used "crude and sexually suggestive language towards" the plaintiff, "no reasonable jury could find that those two men were motivated by a genuine sexual desire for or attraction to King in these circumstances."

Next, Embraer argues that, considering all of the circumstances, Martinez's conduct was not objectively severe enough to create a sexually hostile work environment.  (*Id.* at 13.)  Downplaying the conduct as it goes, Embraer recounts the major allegations made by the plaintiff

_____

[8]Again, in *Satterfield*, the court indicated that, where the plaintiff asserts Title VII liability against a non-employer, the central issue is the ability of the defendant to "control" the plaintiff's job performance and opportunities.  295 F.3d at 617.  As Embraer was in "control" of the plaintiff's employment, there is no dispute that Embraer has potential Title VII/THRA liability, even though it was not the plaintiff's employer.

and concludes that these events cannot be considered "so extreme" as to alter the terms and conditions of employment. (*Id.*) That is, the alleged behavior is "undoubtedly vulgar and wholly inappropriate for the workplace," but it does not rise to the level of "sexually hostile," largely because, again, the conduct was not motivated by the plaintiff's sex. (*Id.*)

Finally, Embraer argues that there was no reason it would have known of any harassment prior to when the plaintiff reported it to Lowe. (*Id.* at 15.) Once it learned of the situation, Embraer argues, it acted reasonably, conducting a full investigation and issuing an oral warning to those accused. (*Id.*) Therefore, Embraer argues, not only was there no basis to know of the harassment as it was ongoing, it implemented prompt and appropriate corrective action as soon as it learned of the alleged harassment. (*Id.* at 16.)

In response, the plaintiff argues that he has come forward with more than enough evidence of "nudity, acts of simulated masturbation, verbal sexual advances, sexually aggressive touching" and so forth for a reasonable jury to find that the harassment was sufficiently severe and that the harassment engaged in by Martinez was "because of sex." (Docket No. 54 at 5-7 citing *Reagan v. City of Knoxville*, 2010 WL 2639933, *5 (E.D. Tenn. June 28, 2010)(finding that one simulated sex act by a harasser on the plaintiff, even if done with aggression, was sufficient to raise a fact issue as to whether the conduct was motivated by sexual desire). Finally, the plaintiff argues that he informed his direct supervisor (Stier) of the harassment, and, in response, nothing was done. (*Id.* at 9.)

Ultimately, fact issues on each of these remaining elements preclude summary judgment for Embraer on this claim. While there is limited evidence in the record that Martinez has

22

engaged in homosexual conduct, the plaintiff's allegations, which are supported by substantial deposition testimony, suggest that a reasonable jury could find that Martinez harassed the plaintiff out of some sense of sexual desire.  Martinez is alleged to have repeatedly attempted to massage the plaintiff, to have grabbed or attempted to grab the plaintiff's genitals, to have made many crude, sexually suggestive comments to the plaintiff, and to have watched the plaintiff use the bathroom.  On this record, the court cannot conclude, as a matter of law, that Martinez was not, in some way, motivated by a sexual desire for the plaintiff.

Also, a reasonable jury, viewing the harassment objectively, could find it to be sufficiently severe to have altered the terms and conditions of the plaintiff's employment.  There is very little in the record to suggest any other basis for the plaintiff's sudden (and undoubtedly highly inconvenient) departure from Embraer other than the abuse that he was receiving at work.  A reasonable jury could find that constant sexually explicit comments, grabbing, and other disconcerting events, such as seeing Martinez watching the plaintiff in the bathroom, was harassment severe enough to alter the terms and conditions of the plaintiff's employment.

On the issue of employer liability, again, a reasonable jury could find that Embraer "knew or should have known" about the harassment.  Stier, who was the plaintiff's direct supervisor on the night shift, conceded that the plaintiff told him that Martinez was "sick," and the plaintiff maintains that he told Stier that Martinez's conduct needed to be stopped.  There is no dispute that Stier took no action to stop Martinez's harassment.  To be sure, the plaintiff could have done more to make high-level supervisors aware of the harassment, but, again, to put an employer on notice, the plaintiff need only report the harassment to a supervisor that the plaintiff "reasonably

believes" was authorized to receive such complaints and report them to management. As Stier was the plaintiff's direct supervisor on his shift, a reasonable jury could find that the plaintiff did enough to put Embraer on notice.

Therefore, fact issues on Martinez's motivations, the severity of the harassment, and the sufficiency of the notice provided to Embraer preclude summary judgment for Embraer on this claim.

## CONCLUSION

All claims in this case will be dismissed, except for the plaintiff's hostile work environment claim against Embraer, which is only viable on a theory of co-worker harassment.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge